IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION ONE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 77749-1-I |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | UNPUBLISHED OPINION |
| | ) | |
| TROY DARRIN MEYERS, | ) | |
| | ) | |
| Appellant. | ) | FILED: September 4, 2018 |

SCHINDLER, J. — The court found Troy Darrin Meyers guilty of unlawful possession of methamphetamine with intent to deliver and unlawful possession of cocaine. Meyers seeks reversal of the convictions, arguing the court erred in denying his motion to suppress the evidence seized from his house. Meyers contends the affidavit in support of the search warrant did not support finding probable cause to issue the search warrant. Meyers also contends the court erred by imposing discretionary legal financial obligations. Because the affidavit supports probable cause to issue the search warrant, we affirm the convictions. But we remand to consider the ability to pay the discretionary $2,000 drug enforcement fund fee and upon submission of a verified petition of indigency, the $100 crime laboratory fee.

FACTS

In 2014, an informant contacted Department of Corrections (DOC) probation officer Rob Campbell about Troy Darrin Meyers selling drugs. DOC Officer Campbell had worked with the informant for several years. The informant told Campbell that because she did not get along with Meyers, he should talk to Patrick Lenhart and Adrienne Woods.

In April, Campbell met with Lenhart and Woods. Campbell contacted Vancouver Police Department East Precinct Neighborhood Response Team Detective Erik Jennings. Detective Jennings met with Campbell, Lenhart, and Woods. Woods agreed to work with the police to conduct a "controlled buy" of methamphetamine from Meyers. Woods requested her identity and the information she provided remain confidential.

On May 21, Woods called Meyers to arrange to meet him at his house to buy methamphetamine. The police searched Woods to ensure she did not have "money and contraband." Detective Jennings gave Woods the prerecorded "buy money." A number of other officers also participated in the controlled buy. During the approximate 10 minutes she was in Meyers' house, Woods sent text messages to Detective Jennings. After Woods left the house, she met Detective Jennings and handed him a "baggie" with a white crystalline substance. Detective Jennings confirmed the white substance was methamphetamine.

On May 23, 2014, Detective Jennings submitted an affidavit in support of the request for a warrant to search Meyers' residence for evidence of possession of methamphetamine with intent to deliver. The affidavit refers to Woods as the

"CI."[1] Detective Jennings describes the relationship between the CI and Meyers

and Woods' previous purchases of methamphetamine.

> [T]he CI stated he/she has known a white male subject identified as Troy Meyers for approximately 9 months. During this time period, the CI stated he/she has purchased Methamphetamine from [Meyers] 2 to 3 times a week. During the CI's friendship/ relationship with [Meyers], the CI stated he/she has made over 50 purchases of Methamphetamine from [Meyers]. When asked, CI stated every time he/she has contacted [Meyers], he always had or was able to obtain Methamphetamine. The CI told me he/she has been present on numerous occasions when [Meyers] has sold Methamphetamine to others. During this interview, your affiant obtained a photo of Troy Darrin Meyers and showed it to the CI. The CI identified [Meyers] as the person he/she has purchased Methamphetamine from.

The affidavit describes the May 21 controlled buy of methamphetamine

from Meyers.

> Within the past 72 hours (May 21 - May 23, 2014) your affiant contacted. [sic] At this time, the CI stated he/she was ready to set up a deal with [Meyers]. We then made arrangements to meet. Detective Ruth and I met with the CI and transported him/her to the Vancouver West Police Precinct, 2800 NE Stapleton Rd. At this time, the CI was searched. There were no drugs, money and/or contraband located. I then had the CI telephone [Meyers] on his cell phone (360-281-1568).
>
> Following contact and as the two exchanged text messages, the CI made arrangements to purchase an undisclosed amount of methamphetamine. Arrangements were then made for the CI to travel to [Meyers]'s home, 9810 NE St., to conduct the transaction.
>
> I provided the CI with pre-recorded buy money, after which I and other NRT[2] Detectives maintained watch over the CI until he / she's arrival at [Meyers]'s residence. The CI approached the front door of 9810 NE 67th St and was observed entering the residence. After a few minutes the CI was observed exiting the front door. The CI was again kept under surveillance until he/she was contacted by

---

[1] Confidential informant.

[2] Neighborhood response team.

3

law enforcement. Upon meeting up, the CI immediately turned over a clear plastic baggie, with what appeared to be a small quantity of a white crystal substance, which appeared to be Methamphetamine.

Again the CI was searched and there were no drugs, money and/or contraband located.

The CI stated he/she purchased the Methamphetamine from [Meyers]. The CI stated he/she handed the money to [Meyers] who provided him/her with the Methamphetamine, which he produced from a black fire resistant lock box in his bedroom.

The CI stated there were additional methamphetamine in the residence as well as a digital scale, packaging material (plastic baggies) and a drug "snort" plate.

The affidavit states the CI also told Detective Jennings that Meyers' girlfriend Virginia lives at the house and that Meyers owns the Chevrolet truck and the bus parked in front of the house.

The affidavit states, "This CI is providing this information out of a community interest and frustration with the suspect's drug dealing activities." The affidavit states the CI has used drugs for more than eight years and has two felony convictions, one gross misdemeanor conviction, and three misdemeanor convictions.

The CI has intimate knowledge of the drug subculture including drug use and distribution. The CI has demonstrated his/her knowledge of controlled substances, specifically Methamphetamine by detailing his/her own involvement (8 plus years) with controlled substance.

On May 23, a Clark County district court judge found probable cause to issue a warrant to search Meyers' residence for evidence of the crime of possession of a controlled substance with intent to deliver.

4

On May 28, the East Precinct Neighborhood Response Team executed the search warrant. Before executing the search warrant, the police detained Meyers. Meyers waived his Miranda[3] rights. Meyers said he used cocaine and sold methamphetamine to supplement his income. Meyers admitted he "obtain[ed]" a quarter pound of methamphetamine approximately every three weeks. Meyers said there would be one to two ounces of methamphetamine and possibly some cocaine inside a black safe on his bed. The police found a large quantity of methamphetamine in small plastic bags, a small amount of cocaine, a small amount of crack cocaine, and OxyContin in the black safe and a digital scale and cash nearby. The police also found methamphetamine in a concealed compartment in the master bedroom bathroom closet.

The State charged Meyers with possession of a controlled substance with intent to deliver methamphetamine and unlawful possession of cocaine.

Meyers filed a motion to suppress the statements he made to the police and several motions to suppress the evidence seized from his house.

The court held a hearing on the CrR 3.5 and CrR 3.6 motions on January 14 and April 24, 2015. Meyers asserted the search warrant was overbroad. Meyers challenged the controlled buy and argued the affidavit did not support finding the CI reliable. Meyers argued the police did not conduct an adequate search of the informant. Meyers argued the search warrant was invalid because Detective Jennings did not disclose material information.

---

[3] Miranda v. Arizona, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

5

At the hearing on January 14, the State identified the CI as Adrienne Woods and provided the informant file to the defense. The court admitted the informant file into evidence as an exhibit. A number of witnesses testified at the hearing, including DOC Officer Campbell, Detective Jennings, and Meyers.

On August 4, 2015, the court entered findings of fact and conclusions of law on the CrR 3.5 and CrR 3.6 motions. The court found Meyers knowingly, intelligently, and voluntarily waived his Miranda rights and his statements were admissible. The court denied the CrR 3.6 motion to suppress the evidence seized by the police. The court entered a seven-page decision on the CrR 3.6 motion.

Two months after entry of the CrR 3.6 findings of fact and conclusions of law, Meyers filed a "Motion to Reopen Evidence in Suppression Hearing Based upon Invalid Search Warrant[,] Unlawful Traffic Stop[,] Unlawful Arrest[,] Unlawful Search of Person[,] Unlawful Search of Vehicle and Motion for Ruling on Lawfulness of Seizure of Money." The court granted the motion to rule on the legality of seizing money from Meyers when he was arrested. The court ruled, "I cannot find that there's a sufficient nexus, and I am going to suppress the money seized from his wallet." The court denied the motion to reopen the evidentiary hearing.

Meyers stipulated to a bench trial. The court found that "[o]n May 28, 2014," Meyers "knowingly and unlawfully possessed methamphetamine . . . with the intent to deliver the methamphetamine to another within 1000 feet of a school bus stop" and "knowingly and unlawfully possessed cocaine."

ANALYSIS

Meyers seeks reversal of the convictions. Meyers asserts the court erred in denying his motion to suppress the evidence the police seized from his house. Meyers asserts the affidavit in support of the search warrant does not establish probable cause. Meyers contends the affidavit does not establish that Woods is reliable and absent the material misrepresentations and omissions, the affidavit does not support probable cause to issue the warrant.

The Fourth Amendment to the United States Constitution provides, "[N]o warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." Article I, section 7 of the Washington Constitution provides that "[n]o person shall be disturbed in his private affairs, or his home invaded, without authority of law."

A search warrant may issue only on a determination of probable cause. State v. Jackson, 150 Wn.2d 251, 264, 76 P.3d 217 (2003). Probable cause exists when the affidavit in support of the search warrant "sets forth facts and circumstances sufficient to establish a reasonable inference that the defendant is probably involved in criminal activity and that evidence of the crime may be found at a certain location." Jackson, 150 Wn.2d at 264.

Veracity of the Informant

Meyers contends the affidavit does not establish probable cause based on the information from Woods. Washington courts use the two-prong test in

7

Aguilar v. Texas, 378 U.S. 108, 84 S. Ct. 1509, 12 L. Ed. 2d 723 (1964),[4] and Spinelli v. United States, 393 U.S. 410, 89 S. Ct. 584, 21 L. Ed. 2d 637 (1969),[5] to evaluate the existence of probable cause based on information from a confidential informant. State v. Jackson, 102 Wn.2d 432, 435-43, 688 P.2d 136 (1984). The two-prong test addresses the informant's (1) "basis of knowledge" and (2) "veracity." State v. Vickers, 148 Wn.2d 91, 112, 59 P.3d 58 (2002).

> [T]o create probable cause for a search warrant to issue: (1) the officer's affidavit must set forth some of the underlying circumstances from which the informant drew his conclusion so that a magistrate can independently evaluate the reliability of the manner in which the informant acquired his information; and (2) the affidavit must set forth some of the underlying circumstances from which the officer concluded the informant was credible or his information reliable.

Jackson, 102 Wn.2d at 435.

The affidavit of Detective Jennings sets forth facts and circumstances that allowed the magistrate to independently evaluate reliability and showed the information Woods provided was reliable. The affidavit states Woods admitted she used drugs and purchased methamphetamine from Meyers more than 50 times in the previous nine months. Where a person admits self-incriminating activity to the police, we presume the statement is true. State v. Chenoweth, 160 Wn.2d 454, 483, 158 P.3d 595 (2007) ("Statements against penal interest are intrinsically reliable because a person is unlikely to make a self-incriminating admission unless it is true.").

---

[4] Abrogated by Illinois v. Gates, 462 U.S. 213, 103 S. Ct. 2317, 76 L. Ed. 2d 527 (1983).

[5] Abrogated by Gates, 462 U.S. 213.

The affidavit states Woods identified the specific location of the methamphetamine in Meyers' locked bedroom safe and confirmed additional methamphetamine, a digital scale, packaging material, and a drug "snort" plate were present in the residence. See State v. Casto, 39 Wn. App. 229, 234, 692 P.2d 890 (1984) (Where the informant " 'goes in empty and comes out full,' his assertion that drugs were available is proven, and his reliability confirmed." Probable cause may exist where the informant "can also assert that more drugs are present, or where their presence can be presumed.").

The affidavit states Woods also provided accurate information about Meyers' girlfriend Virginia and the vehicles Meyers owned.

> The CI stated [Meyers] lives at the residence with his girlfriend, "Virginia". The CI stated [Meyers] owns a "lowered" white Chevy truck parked in the driveway and a large black tour style bus, parked on the street in front of the residence. I later drove by the residence and obtained the license plate of the white Chevy truck parked in the driveway: Washington "B62684K" and the black tour style bus parked on the street: "ALJ0759".

Detective Jennings states, "[T]hese vehicles are both registered to Troy Darrin Meyers. I also found police contacts regarding the Chevy truck and discovered the name Virginia Wall."

The affidavit set forth independent and corroborated facts to allow the magistrate to independently evaluate the reliability of Woods and the circumstances to conclude Woods and the information were credible.

As Meyers concedes, a properly executed controlled buy can establish both the basis of the knowledge prong and the veracity prong. Casto, 39 Wn. App. at 234. The affidavit supports finding a properly executed controlled buy.

9

Meyers challenges the finding that police "kept Woods under constant visual surveillance" as she approached and then left Meyers' house.

We determine whether substantial evidence supports the trial court's findings of fact and whether those findings support the conclusions of law. State v. Garvin, 166 Wn.2d 242, 249, 207 P.3d 1266 (2009). Substantial evidence is evidence sufficient to persuade a fair-minded, rational person of the truth of the finding. State v. Levy, 156 Wn.2d 709, 733, 132 P.3d 1076 (2006). Unchallenged findings are verities on appeal. State v. Hill, 123 Wn.2d 641, 644, 870 P.2d 313 (1994). We review conclusions of law pertaining to the suppression of evidence de novo. Levy, 156 Wn.2d at 733.

The court found the police and Woods were in contact throughout the controlled buy.

> Detective Jennings and other officers kept Woods under constant visual surveillance as she approached and departed Meyers' residence. Woods entered Meyers['] residence and stayed inside approximately 10 minutes. Detective Jennings received multiple text messages from Woods while she was inside. The officers maintained visual surveillance of the residence and Woods as she exited and returned to the vehicle. Woods turned a plastic bag of methamphetamine to the officers and she was searched by Detective Gabriel who told Detective Jennings she located no drugs, cash, or weapons on Woods' person.[6]

Substantial evidence supports the challenged findings. Detective Jennings and two other officers participated in the controlled buy. Detective Jennings stated he parked about two blocks away from the house. Detective Jennings testified he did not see Woods the entire time but he was in contact with the other officers by radio to ensure "[s]he was observed the entire time."

---

[6] Emphasis added.

While Woods was inside the house for approximately 10 minutes, she sent text messages to Detective Jennings. After she left Meyers' house, she walked down the street to the previously agreed upon meeting point. Detective Jennings testified the other officers observed Woods after she left the house until he met Woods at the meeting point.

Material Misrepresentations and Omissions

Meyers challenges the court's finding that omissions in the affidavit were not material. Material falsehoods that are intentionally included in the affidavit or with reckless disregard for the truth, or deliberate or reckless omissions of material information from the warrant may invalidate the search warrant. State v. Ollivier, 178 Wn.2d 813, 847, 312 P.3d 1 (2013). In Chenoweth, the Washington Supreme Court held that under article I, section 7, only material falsehoods or omissions made "recklessly or intentionally" invalidate a warrant. Chenoweth, 160 Wn.2d at 478-79.

A misstatement or omission must be both (1) reckless or intentional and (2) material. State v. Gentry, 125 Wn.2d 570, 604, 888 P.2d 1105 (1995). Negligence or innocent mistakes are insufficient to invalidate the warrant. State v. Clark, 143 Wn.2d 731, 751, 24 P.3d 1006 (2001). Recklessness is shown where the warrant affiant entertained " 'serious doubts' " as to the truth of facts or statements made in the affidavit. Clark, 143 Wn.2d at 751[7] (quoting State v. O'Connor, 39 Wn. App. 113, 117, 692 P.2d 208 (1984)). "Such 'serious doubts' are 'shown by (1) actual deliberation on the part of the affiant, or (2) the

---

[7] Internal quotation marks omitted.

11

existence of obvious reasons to doubt the veracity of the informant or the accuracy of his reports.' " Clark, 143 Wn.2d at 751 (quoting O'Connor, 39 Wn. App. at 117).

If the defendant establishes material misrepresentation or omissions, "then the material misrepresentation must be stricken or the omitted material must be included and the sufficiency of the affidavit then assessed as so modified." Ollivier, 178 Wn.2d at 847. If at that point the affidavit fails to support a finding of probable cause, "the warrant will be held void and evidence obtained when the warrant was executed must be suppressed." Ollivier, 178 Wn.2d at 847. "The determination whether the qualifying information amounts to probable cause is a legal question that is reviewed de novo." Ollivier, 178 Wn.2d at 848.

Meyers challenges Detective Jennings statement that before the controlled buy, "the CI was searched. There were no drugs, money and/or contraband located." Meyers asserts the statement is a material misrepresentation or omission because Detective Jennings did not state he was not personally present during the search. The court found:

> **DETECTIVE JENNINGS NOT PRESENT FOR SEARCH OF CI**
> Detective Jennings had personal knowledge that the CI was searched. The court finds that any omission as to whether Detective Jennings was personally present during the search is not material.

Substantial evidence supports the finding that "any omission as to whether Detective Jennings was personally present during the search is not material." The record establishes Detective Jennings directed and had personal knowledge of the search. Detective Jennings testified that on the day of the controlled buy,

a search of Woods "was conducted" at the precinct by Detective Julie Gabriel. Detective Jennings stated, "When that search was completed, I was informed Ms. Woods had no drugs on her, no money, no weapons." After the controlled buy, Detective Jennings drove Woods back to the precinct and Detective Gabriel searched Woods again and found "nothing." The unchallenged findings state:

> Detective Jennings testified that Detective Julie Gabriel searched the informant, Adrienne Woods before and after the controlled buy that formed the basis for probable cause to arrest Meyers and that Gabriel indicated to him that Woods had no drugs, cash or weapons on her person.[8]

Meyers argues the court erred in finding the failure to include information about Meyers' "eviction" of Woods from his house and the payment to Woods of $100 on May 29 were not material and intentional omissions of fact. The findings state:

> **A. CI'S EVICTION FROM MEYERS' RESIDENCE**
> Detective Jennings testified that he knew Woods had been kicked out of the Meyers residence but did not think there was any animosity between Woods and Meyers. The court finds this omission is not material or intentional.
> **B. CI PAID FOR HER SERVICES**
> The evidence in the record shows that Detective Jennings paid Woods $100 on May 29, 2014, well after the search warrant

---

[8] We also note the court rejected the argument that Woods "hid methamphetamine in her vagina" as not credible. The unchallenged findings state:

> Meyers argues that law enforcement failed to conduct a sufficient search of the informant. He supplies no authority for the contention that searches prior to a controlled buy should include a search of the genital area and of the vagina or other body cavities.

> . . . .

> To follow Meyers' argument to its logical conclusion, the court must believe that Woods hid methamphetamine in her vagina and retrieved the methamphetamine from her vagina inside Meyers' residence or after exiting, while at the same time sending multiple texts to Detective Jennings. She would have to somehow have known the amount of methamphetamine she was purchasing in advance so that she could produce methamphetamine from her vagina consistent with the amount of cash Detective Jennings supplied to her and she would have to dispose of the cash provided for the purchase.

was served on May 28, 2014. (Defense Exhibit 8) No evidence in the record indicates that Woods was giving [sic] any consideration or benefit prior to the buy, thus the payment afterwards, absent any evidence of an agreement to pay Woods for her services does not constitute an omission.

The testimony showed Woods and Lenhart lived at Meyers' house for nine months. After Meyers and Lenhart had a dispute, Lenhart and Woods moved out. But Meyers and Woods continued to have a good relationship. Detective Jennings testified that he knew Woods and Lenhart had been "kicked out of the house" but said, "There was no indication of animosity. . . . [T]here was no ill will that I was told about between [Woods] and Mr. Meyers." The unchallenged findings state, "Detective Jennings . . . knew that Woods had been kicked out of Meyers' residence, but did not believe there was any animosity between Woods and Meyers."

There is no dispute that Detective Jennings "paid Woods $100 on May 29, 2014." The record supports the finding that there was no evidence to indicate that "Woods was giv[en] any consideration or benefit prior to the buy."

Even if we assume failure to include information about the "eviction" and payment are material omissions, the affidavit supports probable cause to issue the search warrant. To establish probable cause, the facts need only show "the probability of criminal activity, not a prima facie showing of it." State v. Maddox, 152 Wn.2d 499, 505, 98 P.3d 1199 (2004).

> Probable cause exists if the affidavit in support of the warrant sets forth facts and circumstances sufficient to establish a reasonable inference that the defendant is probably involved in criminal activity

14

and that evidence of the crime can be found at the place to be searched.

State v. Thein, 138 Wn.2d 133, 140, 977 P.2d 582 (1999).

Meyers also contends the court erred by failing to enter a finding on the omission of the Oregon criminal convictions in the affidavit in support of the search warrant. The record establishes Meyers did not present evidence about the Oregon criminal convictions during the CrR 3.6 hearing. For the first time in the motion to reopen the CrR 3.6 suppression hearing, Meyers argued a criminal history report showed that in addition to the convictions in the affidavit, Woods had Oregon convictions. The court responded, "I actually looked up her criminal history, so I'm familiar with it."

The court did not abuse its discretion in declining to reopen the suppression hearing or err in denying the motion to suppress. State v. Luvene, 127 Wn.2d 690, 711, 903 P.2d 960 (1995)

Legal Financial Obligations

Meyers contends the court erred by imposing legal financial obligations (LFOs) without considering his ability to pay. The court imposed the $500 victim assessment fee, a $2,000 drug enforcement fund fee, the $100 DNA[9] fee, the $200 criminal filing fee, and a $100 crime laboratory fee.

In State v. Blazina, 182 Wn.2d 827, 837-38, 344 P.3d 680 (2015), the Washington Supreme Court held RCW 10.01.160(3) mandates the sentencing court to engage in an individualized inquiry into the defendant's present and future ability to pay discretionary LFOs.

---

[9] Deoxyribonucleic acid.

The court did not err by imposing the mandatory DNA, victim assessment, and criminal filing fees. State v. Shelton, 194 Wn. App. 660, 673-74, 378 P.3d 230 (2016), review denied, 187 Wn.2d 1002, 386 P.3d 1088 (2017); State v. Gonzales, 198 Wn. App. 151, 154-55, 392 P.3d 1158, review denied, 188 Wn.2d 1022, 398 P.3d 1140 (2017).

But the court erred by imposing the $2,000 drug enforcement fund fee without engaging in an inquiry about Meyers' present and future ability to pay. The conclusory statement that "the defendant is presently indigent but is anticipated to be able to pay financial obligations in the future" does not meet the mandate to engage in an individualized inquiry about the present and future ability to pay. Blazina, 182 Wn.2d at 837-38.

RCW 69.50.430(2) mandates a $2,000 fine for an adult offender convicted of a second or subsequent violation of specified provisions of the Uniform Controlled Substances Act, chapter 69.50 RCW, and "[u]nless the court finds the adult offender to be indigent, this additional fine may not be suspended or deferred by the court."[10]

RCW 43.43.690(1) addresses imposition of the laboratory fee. RCW 43.43.690(1) states:

> When an adult offender has been adjudged guilty of violating any criminal statute of this state and a crime laboratory analysis was performed by a state crime laboratory, in addition to any other disposition, penalty, or fine imposed, the court shall levy a crime laboratory analysis fee of one hundred dollars for each offense for which the person was convicted.

But RCW 43.43.690(1) expressly states, "Upon a verified petition by the person

---

[10] Emphasis added.

16

assessed the fee, the court may suspend payment of all or part of the fee if it finds that the person does not have the ability to pay the fee."[11]

On remand, the court shall engage in an inquiry on the present and future ability of Meyers to pay the $2,000 drug enforcement fund fee. If Meyers submits a verified petition, the court shall also determine whether to suspend all or part of the $100 crime laboratory fee.

Statement of Additional Grounds

Meyers raises a number of issues in his statement of additional grounds.[12] Contrary to his assertion, the record shows the State provided a certified copy of the affidavit in support of the search warrant and we granted his motion to supplement the record with the hospital records.

Meyers argues the statements he made to the police were not voluntary. The unchallenged findings do not support his argument. State v. Gasteazoro-Paniagua, 173 Wn. App. 751, 755, 294 P.3d 857 (2013) (unchallenged findings of fact following a CrR 3.5 hearing are verities on appeal). Citing Bailey v. United States, 568 U.S. 186, 133 S. Ct. 1031, 185 L. Ed. 2d 19 (2013), Meyers argues he was unlawfully detained while the police executed the search warrant. Unlike in the case he cites, there was probable cause to arrest Meyers. See Bailey, 568 U.S. at 200-01.

Meyers claims the judge was biased. Meyers cannot show that a reasonable person who knows and understands all the relevant facts would

---

[11] Emphasis added.

[12] The other arguments Meyers makes are adequately addressed in the brief on appeal. RAP 10.10(a).

No. 77749-1-I/18

conclude he did not receive a fair, impartial, and neutral hearing. State v.

Gamble, 168 Wn.2d 161, 187, 255 P.3d 973 (2010).

Meyers contends the convictions constitute the same criminal conduct. We review the determination of what constitutes the same criminal conduct for abuse of discretion. State v. Johnson, 180 Wn. App. 92, 100, 320 P.3d 197 (2014). Possession of methamphetamine with intent to deliver and unlawful possession of cocaine do not constitute the same criminal conduct. State v. Hernandez, 95 Wn. App. 480, 484-85, 976 P.2d 165 (1999). Meyers asserts his prior felony convictions wash out because his 2005 driving with a suspended license conviction is unconstitutional. The record shows Meyers did not meet his burden of establishing the prior conviction is unconstitutional. In re Pers. Restraint of Williams, 111 Wn.2d 353, 368, 759 P.2d 436 (1988).

We affirm the convictions but remand for an individualized inquiry into the ability of Meyers to pay the $2,000 drug enforcement fund fee and if he submits a verified petition, the $100 crime laboratory fee.

Schindler, J

WE CONCUR:

Trickey, J          Becker, J.

18